## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| **KATHRYN HANEGRAAF** : | **CIVIL ACTION NO:** |
| 1018 Autumn River Run : | |
| Philadelphia, PA 19128 : | |
| : | |
| Plaintiff : | |
| : | |
| V. : | **JURY TRIAL DEMAND** |
| : | |
| **PAUL MORELLI DESIGN, INC.** : | |
| 1118 Walnut Street : | |
| Philadelphia, PA 19107 : | |
| : | |
| And : | |
| : | |
| **PAUL MORELLI** : | |
| 3275 Creamery Road : | |
| New Hope, PA 18938 : | |
| : | |
| Defendants : | |

## COMPLAINT

## I.    INTRODUCTION

1.    Plaintiff, Kathryn Hanegraaf, brings this civil rights action to remedy the sex discrimination and hostile work environment she endured as an employee of Paul Morelli Design, Inc.  Plaintiff further alleges that she was terminated from her employment with Paul Morelli Design based on her sex, and in retaliation for seeking redress for the discrimination and hostile work environment she endured.

2.    Plaintiff seeks relief for sex discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) et seq. ("Title VII") and the Philadelphia Fair Practices Ordinance, Philadelphia Code, §§ 9-1101 et seq.

1

3.      Plaintiff has satisfied all administrative exhaustion prerequisites necessary to file this suit.


II.     **PARTIES, JURISDICTION AND VENUE**

4.      Plaintiff Kathryn Hanegraaf (hereinafter "Hanegraaf") is an adult female, who is a citizen of the United States and resides at the above-captioned address.

5.      Defendant Paul Morelli Design, Inc. (hereinafter "PMD") is a Pennsylvania Corporation, with its headquarters located at the above-captioned address.

6.      Defendant Paul Morelli (hereinafter "Morelli") is the President of PMD and resides at the above-captioned address.

7.      PMD is in the business of the design, manufacture and sale of high end jewelry.

8.      PMD has more than 15 full time employees.

9.      At all times relevant to this Complaint, Plaintiff worked for PMD at their facility located at 1118 Walnut Street, Philadelphia, PA 19107.

10.     PMD is an "employer" within the meaning of Title VII, 42 U.S.C. § 2000(e) et seq. and the Philadelphia Fair Practices Ordinance, Philadelphia Code, §§ 9-1101 et seq.

11.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1331.  This Court has supplemental jurisdiction of Plaintiff's claims under the Philadelphia Fair Practices Ordinance pursuant to 28 U.S.C. § 1367.

12.     Venue is appropriate in this judicial district because at all times material to this Complaint Plaintiff worked for PMD in this judicial district and the material acts and omissions giving rise to this action all occurred in this judicial district.

### III.   FACTUAL ALLEGATIONS

13.   Hanegraaf is 28 years old, and she was still 24 years old at the time of the incidents described in this charge.

14.   Morelli, who is married with adult children, is 66 years old, and thus nearly four decades older than Hanegraaf.

15.   Hanegraaf started working for PMD on September 3, 2012, as the head of marketing.  She also had responsibilities for photography of the merchandise.

16.   Hanegraaf remained in this position until she was terminated on March 21, 2013.

17.   In her position, Hanegraaf reported directly to Morelli, and she also worked directly with other managers and employees at the company.

18.   At all times Hanegraaf performed her job well and met or exceeded all of her employer's legitimate expectations.

19.   During the entire time of her employment, up until the day she was fired, Hanegraaf was never disciplined for any reason.

20.   After Hanegraaf started working at PMD, Morelli started making inappropriate, sexual comments about her body.

21.   For example, on one occasion at work Morelli said to Hanegraaf words to the effect, "You've got a big butt.  I like my women a little thicker."

22.   Morelli would also regularly invade Hanegraaf's personal space, getting abnormally physically close to her.  This made her feel uncomfortable.

23.   On or about December 21, 2012, Morelli approached Hanegraaf, and told her that he wanted her to start training to take on additional responsibilities, in particular, being in charge of customer service, in addition to her marketing responsibilities.

3

24.     Morelli told Hanegraaf that this would result in a "very significant" pay raise for her, both for the customer service responsibilities, and for other additional duties plaintiff had already taken on.  Morelli told Hanegraaf the pay raise would leave her "not worrying about money at all."  Morelli indicated the training for the additional responsibilities would start taking place after the Christmas holidays.  Hanegraaf agreed to take on the additional responsibilities.

25.     After the holiday, Hanegraaf approached Morelli about the training to take on the additional responsibilities in customer service.

26.     Morelli told Hanegraaf that it would take time, and that Hanegraaf should just "pay attention" to what the head of customer service did in her job.

27.     Morelli told Hanegraaf that he wanted her to travel with him to the "Gem Show" being held in Tucson, Arizona, a convention for suppliers of raw materials for jewelry.

28.     As directed, Hanegraaf traveled with Morelli to the Gem Show, in early February, 2013.

29.     Hanegraaf and Morelli flew out together for the Gem Show, and they also stayed together at the same hotel, the Hilton Hotel Conquistador.

30.     During the trip, Morelli repeatedly sexually harassed Hanegraaf, and pressured her to have sex with him.

31.     For example, one day during the show Morelli and Hanegraaf saw a particular necklace.

32.     Morelli expressed admiration for the necklace, and expressed a desire to sell it.

33.     In response, Hanegraaf said words to the effect that if Morelli allowed her to wear the necklace, she would sell it for him.

4

34.    Morelli responded by saying words to the effect, "the only way that would happen is if you would wear it naked."

35.    Hanegraaf was offended, humiliated and upset by this overt sexual comment, and responded saying words to the effect "well that's never going to happen," and she abruptly walked away from Morelli.

36.    Later during the convention Morelli and Hanegraaf were walking together through the convention center.

37.    Without warning, Morelli smacked Hanegraaf on her buttocks with his bare hand, and laughed at Hanegraaf when he did so.

38.    Shocked by Morelli's inappropriate touching, Hanegraaf abruptly stopped walking, and stared angrily at Morelli, who then just walked away.

39.    Later during the convention, Morelli and Hanegraaf went out to dinner together. They were the only two people at their table.

40.    The restaurant where they ate happened to have paper table coverings

41.    Morelli suggested that they play the game of "hangman," and he said he would come up with the first word.

42.    Morelli wrote down five blank spaces indicating a five letter word.

43.    Hanegraaf started to guess at the letters, and as she did so it gradually became apparent that the word Morelli had selected was going to be a vulgar sexual reference.

44.    Hanegraaf stopped playing the game, and said to Morelli words to the effect that it appeared the word he chose was inappropriate.

45.    Morelli then gleefully told Hanegraaf that the word he chose was "pussy" and that they were playing "dirty hangman."

46.     Once again, Hanegraaf was offended, humiliated and upset by Morelli's sexually harassing behavior, and she refused to play the "game" with him any longer.

47.     Morelli and Hanegraaf went out to dinner together on another evening during the convention.  Again, they were the only two at their table.

48.     Both Morelli and Hanegraaf drank wine during the meal.

49.     During the meal Morelli said to Hanegraaf words to the effect, "if I keep drinking you'll have to drive me home and I might put my hand up your skirt."

50.     Hanegraaf was offended, humiliated and upset by Morelli's overt sexual advance, and she rejected his sexual come on.

51.     After the meal, Morelli and Hanegraaf walked toward the rental car they were both using for the trip.

52.     Morelli tried to get into the passenger side of the car.

53.     Recalling Morelli's comment at dinner that he would try to put his hand up her skirt, Hanegraaf told Morelli that she was not allowing this, and that he had to drive.

54.     Morelli then drove the car back to their hotel.

55.     While driving back to the hotel, Morelli said to Hanegraaf words to the effect, "were you really worried I was going to put my hand up your skirt?"

56.     Hanegraaf responded by saying that she was not taking any chances.

57.     Hanegraaf was offended, humiliated and upset by Morelli's overt threat to sexually touch her.

58.     Morelli's sexually harassing behavior during the Tucson trip was an attempt to pressure Hanegraaf into having sex with her.

59.     Hanegraaf was especially worried about Morelli's behavior, because she had been told rumors about other incidents where he had cheated on his wife and had affairs with much younger women.

60.     Hanegraaf returned to work from the Tuscon trip on February 11, 2013.

61.     No one at PMD had an official title as head of human resources.

62.     Likewise, Hanegraaf was never told about the existence of any employee handbook for PMD.

63.     Hanegraaf was never aware of any sexual harassment policy for PMD.

64.     Consequently, there was no identified person at PMD to whom Hanegraaf could complain about sexual harassment.

65.     The only person Hanegraaf could identify as being someone to complain to about what happened was John Winkler, the head of sales for PMD.

66.     Winkler was one person (other than Morelli himself) who appeared to have administrative responsibility for operations at PMD.

67.     Winkler is also the son-in-law of Morelli, having married Morelli's daughter, Justine Morelli.

68.     Because she was so upset about what happened, and because she was worried that Morelli would continue to pressure her to have sex with him, on February 13, 2011, Hanegraaf complained in person to Winkler about Morrelli's sexually harassing behavior.

69.     Hanegraaf told Winkler about all of Morelli's sexually harassing behavior during the Tucson Gem Show, describing the incidents in detail.

70.     Winkler apologized to Hanegraaf about what happened.

71.   Winkler told Hanegraaf that he did not forewarn her about Morelli because "I didn't want to freak you out."

72.   Winkler's comment clearly indicated that Winkler knew that Morelli had a history of sexual harassment and a history of trying to pressure young women into having sex with him.

73.   Hanegraaf was worried that she would suffer retaliation for complaining to Winkler about Morelli's sexually harassing behavior.

74.   Hanegraaf was also worried that by refusing Morelli's advances she was jeopardizing the previously promised promotion and pay raise that Morelli had promised her in December, 2012.

75.   Hanegraaf told Winkler that she wanted to wait and see if Morelli got the hint (from her repeated rejection of his advances) and would stop sexually harassing her.

76.   Winkler indicated he agreed with this approach.

77.   However, on March 11, 2013, while at PMD, there was another incident where Morelli inappropriately touched Hanegraaf.

78.   This time Morelli was moving past Hanegraaf from behind, and as he did so he said "move out of my way," and he slapped Hanegraaf on her buttocks.

79.   Hanegraaf was again offended, humiliated and upset by Morelli's inappropriate touching.

80.   After this incident Hanegraaf complained about Morelli's behavior to Jennifer Ferguson, who was the head of customer service.

81.   Hanegraaf told Ferguson about all of the various incidents of Morelli's sexually harassing behavior.

82.     On March 18, 2013, while at PMD, near the end of the day, Morelli was leaving and had with him a gym bag.

83.     Morelli walked behind Hanegraaf and when he did so deliberately swung his bag into Hanegraaf's buttocks.

84.     When he did so, Morelli said in a sarcastic tone "oops!"

85.     Hanegraaf was shocked and upset by this incident, and aloud said words to the effect, "I can't take it any more."

86.     Winkler was present when this happened, but he did not see it, because he was looking away.

87.     Winkler heard Hanegraaf exclaim, and asked what happened.

88.     Hanegraaf said she had to leave, and she left the building.

89.     On that same day, March 18, 2013, at approximately 5:13 p.m., very shortly after the incident with the gym bag, Hanegraaf sent Morelli the following text message:

> I know that you joke in a somewhat of a crude manner at times – which is not much appreciated – but even if it was just your bag hitting my backside, I really don't appreciate it. Many of your comments while in Tucson were out of line. This struck a nerve as well. I have been upset about it and nervous to bring it up to you, but I am not comfortable working with you if this is to continue. I love working for the company – I really do. But I am already having to take on other work to supplement my income, and dealing with things like what just happened make it hard to concentrate at work.

90.     Morelli never responded to this text.

91.     Shortly after sending this text message to Morelli, Hanegraaf also exchanged a series of text messages with Winkler.

92.     Shortly after sending this text message to Morelli, Hanegraaf then forwarded the same text message to Winkler.

9

93.     Hanegraaf did not immediately receive a response from Winkler, and so later on March 18, 2013, at approximately 6:46 p.m., she sent another text message to Winkler, expressing her hope that Winkler would support her.

94.     Shortly thereafter, on March 18, 2013, at approximately 7:01 p.m., Winkler sent Hanegraaf a text message, explaining that he had talked to Morelli "about the situation," and assuring Hanegraaf that "I do have your back and value what you do for us big time."

95.     In the same text message, Winkler told Hanegraaf that Winkler, Morelli and Hanegraaf would meet and "discuss and resolve this issue" the next morning, i.e., March 19, 2013.

96.     In the same exchange of text messages, Hanegraaf told Winkler that Morelli had never responded to her text message to Morelli.

97.     The next day, March 19, 2013, Winkler approached Hanegraaf and discussed her complaints against Morelli.

98.     Winkler indicated that Morelli might try to lie and deny some of Hanegraaf's accusations.

99.     Later on March 19, 2013, Winkler, Morelli and Hanegraaf met on the third floor at PMD.

100.    When they entered the room Morelli directed Hanegraaf to sit down.

101.    In a flat voice without any emotion Morelli said words to the effect, "I apologize for anything I've said or done to offend you and it won't happen again. Anything else you need from me?"

102.    Hanegraaf was in tears at this point because it was obvious Morelli's apology was not sincere. In response to Morelli's question, Hanegraaf just said "no."

103.    Morelli then walked away.

104.    After Morelli left, Winkler apologized and told Hanegraaf words to the effect, "I'm really sorry he's pulling this."

105.    Winkler then left the room.

106.    Morelli then returned to the room and spoke again to Hanegraaf.

107.    Morelli said words to the effect, "Obviously my humor isn't suited to you.  And I wouldn't have continued to say things if I knew it was upsetting you."

108.    Hanegraaf responded by saying words to the effect, "Paul, I have no idea how you would have thought it was okay to continue acting the way you did, touching me the way you did, when it was obvious with my reactions that it was unacceptable each time – for example, in Tucson ---".

109.    At that point Morelli simply cut Hanegraaf off with a wave of his hand. As Winkler re-entered the room, Morelli said words to the effect, "there is no point in discussing this any further," and Morelli then left the room again.

110.    On March 20, 2013, while at work, Winkler told Hanegraaf that after Hanegraaf sent her text message to Morelli on March 18, 2013, Morelli came up to Winkler, showed him the text message, and said words to the effect, "Look at this shit Kat sent me!  I never fucking touched her with my bag!  What the hell!"

111.    Winkler told Hanegraaf that he responded to Morelli on March 18, 2013, by asking Morelli about what happened in Tucson, which was referenced in Hanegraaf's March 18, 2013 text message.

112.    Winkler told Hanegraaf that in response to his question, Morelli said "nothing fucking happened," and denied any wrongdoing.

11

113.    According to Winkler, Steve Morelli (who is Paul Morelli's brother and who also works at PMD) was present for these discussions on March 18, 2013.

114.    Winkler told Hanegraaf that during the conversation on March 18, 2013, Steve Morelli suggested that they look at the security cameras at PMD.

115.    Winkler told Hanegraaf that on March 18, 2013, Winkler, Paul Morelli and Steve Morelli all looked at the recording from the security camera.

116.    Winkler told Hanegraaf that the recording from the security camera, in fact, showed Morelli looking down at Hanegraaf's buttocks, and then deliberately ramming his bag into her buttocks.

117.    Winkler told Hanegraaf that Morelli had no coherent explanation for his prior, false statement that he had not hit Hanegraaf's buttocks with his bag.

118.    Upon information and belief, defendants failed to preserve this video recording of the incident where Morelli hit Hanegraaf's buttocks with his bag, and allowed the recording to be destroyed.

119.    Winkler also told Hanegraaf that he, Winkler, had sent a text message to his wife Justine (Morelli's daughter) describing Morelli with words to the effect that he was "the biggest dick in the world."

120.    Winkler told Hanegraaf that Justine Morelli asked Winkler what he was talking about, but Winkler did not divulge any details.

121.    Winkler told Hanegraaf that Justine Morelli then sent a text message or other electronic message to Paul Morelli's wife, Anne Marie Morelli, trying to find out what was going on.

122.   Winkler told Hanegraaf that the text message went to an iPad that was on the Morelli's kitchen table, and that Paul Morelli saw the message.

123.   Winkler told Hanegraaf that Paul Morelli responded to the text message that Justine Morelli had tried to send to Anne Marie Morelli, by telling Justine Morelli words to the effect, "your dad is going to kick John's [Winkler's] ass."

124.   On March 21, 2013, Hanegraaf was at work and was supposed to be on a conference call.

125.   Hanegraaf picked up the phone believing that she was picking up a line for the conference call.

126.   Instead, she picked up a line where she could hear Paul Morelli and others discussing Hanegraaf's sexual harassment complaints.

127.   Upon information and belief, Morelli was discussing Hanegraaf's sexual harassment complaints with various people, including lawyers, throughout the day.

128.   On March 21, 2013, near the end of the day, Hanegraaf was approached by Steve Morelli, who asked to speak with her.

129.   Steve Morelli then said to Hanegraaf words to the effect, "we want you to know that we really appreciate and value the work you have been doing for us, but things just aren't working out, so today will be your last day."

130.   Hanegraaf was stunned and began to cry.

131.   Hanegraaf asked Steve Morelli if he could give a more specific reason why she was being fired.

132.   Steve Morelli responded by saying words to the effect, "Well, you know, you hire people and sometimes they work out, sometimes they don't.  This didn't work out."

133. Hanegraaf responded by saying words to the effect, "so just so I'm 100% clear on this, the only reason I am being fired is because 'things didn't work out'?"

134. In response, Steve Morelli said "yes."

135. Hanegraaf collected her belongings and left.

136. The foregoing conduct and statements are only examples of the sexual harassment to which Hanegraaf has been subjected, and they do not constitute every instance of sexual harassment that Hanegraaf has suffered.

137. The conduct of Defendants encompasses the foregoing acts as well as other unlawful acts of harassment.

138. Hanegraaf was the unwilling target of repeated, sexually charged and sex based actions and statements.

139. The Defendants' sexually harassing conduct and statements were unwelcome and offensive to Hanegraaf.

140. Hanegraaf was upset, offended, humiliated and embarrassed by Defendants' sexually harassing conduct and statements.

141. Defendants' actions and statements were of a sexual nature.

142. Defendants' actions and statements were intended to humiliate, embarrass and intimidate Hanegraaf as a woman.

143. Defendants' actions and statements intruded upon Hanegraaf's sexual privacy.

144. The sexual harassment directed at Hanegraaf highlighted Hanegraaf's sex, and used Hanegraaf's sex to embarrass, humiliate and intimidate her.

145. Hanegraaf was forced to endure sexual harassment as a condition of her employment.

146.   The harassment to which Hanegraaf was subjected is sexual in nature and thus inseparable from Hanegraaf's sex.

147.   The sexual harassment to which Hanegraaf was subjected would not have occurred but for Hanegraaf's sex.

148.   The sexually harassing actions and statements directed at Hanegraaf were severe and pervasive.

149.   The sexually harassing actions and statements directed at Hanegraaf altered the conditions of Hanegraaf's employment and created an intimidating, hostile, offensive and abusive working environment because of Hanegraaf's sex.

150.   A reasonable woman and a reasonable person would consider the actions and statements directed toward Hanegraaf to have created an intimidating, hostile, offensive and abusive working environment because of sex.

151.   By subjecting Hanegraaf to a hostile work environment, Defendants caused Hanegraaf to suffer profound emotional distress.

152.   Defendants have known or should have known that their actions and statements have caused profound emotional distress to Hanegraaf.

153.   Defendants and their agents and supervisors, have known or should have known that Hanegraaf was subject to harassment and discrimination.

154.   Upon information and belief, Defendants have no effective policy or remedial scheme for sexual harassment in the workplace, which would provide protection or remediation for Hanegraaf.

155.   Defendants have never taken any effective action to address Hanegraaf's complaints.

156.   Defendants have retaliated against Hanegraaf for her complaints.

157.   By their inaction, failure to respond and retaliation against Hanegraaf, Defendants have condoned the sexual harassment of Hanegraaf.

158.   By trying to pressure Hanegraaf to have sex with Morelli, Defendants have also subjected Hanegraaf to quid pro quo sexual harassment.

159.   By their actions and statements, Defendants have sexually harassed Hanegraaf.

160.   By their actions, Defendants have created and maintained a sexually hostile work environment to which they have subjected Hanegraaf on account of her sex.

161.   The acts of Paul Morelli described herein were committed within the scope of his employment.

162.   Defendant Paul Morelli Design delegated to Defendant Paul Morelli the authority to control the work environment of Hanegraaf.

163.   Defendant Paul Morelli abused the authority delegated by Defendant Paul Morelli Design when he created and maintained a sexually hostile work environment for Hanegraaf.

164.   Defendant Paul Morelli Design is strictly liable for the actions of Paul Morelli in creating and maintaining a hostile work environment to which Hanegraaf has been subjected.

165.   Defendant Paul Morelli Design is vicariously liable for the actions of Paul Morelli in creating and maintaining a hostile work environment to which Hanegraaf has been subjected.

166.   Defendant Paul Morelli Design was negligent in failing to maintain an effective mechanism for preventing, monitoring and correcting sexual harassment in Hanegraaf's work environment.

167. Defendant Paul Morelli Design was negligent in failing to have or to maintain an effective and well-publicized structure for handling and responding to complaints of sexual harassment.

168. Defendant Paul Morelli Design had actual and/or constructive knowledge of the sexual harassment of Hanegraaf, but it have failed and refused to take appropriate and effective steps to rectify the situation.

169. Defendant Paul Morelli Design acted with willful indifference and reckless disregard to the sexual harassment to which Hanegraaf has been subjected.

170. Defendant Paul Morelli Design acted with willful indifference and reckless disregard to Hanegraaf's complaints of sexual harassment.

171. Defendant Paul Morelli Design authorized, participated in and/or ratified or condoned the sexual harassment against Hanegraaf.

172. Defendants also fired Hanegraaf for her refusal to submit to Paul Morelli's pressure that she have sex with him.

173. By their sexual harassment of Hanegraaf, and by their termination of Hanegraaf's employment, Defendants have discriminated against Hanegraaf in the terms and conditions of her employment, on the basis of sex.

174. By complaining about the sexually harassing conduct of Defendant Paul Morelli, Hanegraaf was engaged in protected activity, known to Defendants.

175. Defendants retaliated against Hanegraaf, by firing her for her complaints and protected activity.

176. By the foregoing conduct, Defendants have retaliated against Hanegraaf.

177.    By the foregoing conduct, Defendant Paul Morelli aided and abetted Defendant Paul Morelli Design in the sexual harassment of Hanegraaf and in the creation and maintenance of a hostile work environment for Hanegraaf on account of her sex; in the retaliation against Hanegraaf; and in the discrimination against Hanegraaf.

178.    The actions of Defendants described herein have a malicious and egregious motive.

179.    The foregoing conduct of Defendants is willful and intentional and evidences Defendants' reckless and/or callous indifference.

180.    The acts of Defendants have been intentional and willful and are motivated by actual malice and ill will.

181.    The acts of Defendants were meant to cause, or caused in a gross or reckless manner, egregious and unjustified harm to Hanegraaf.

182.    Defendants have acted in bad faith.

183.    Defendants have acted with wanton recklessness and/or reckless indifference.

184.    As a result of Defendants' unlawful conduct, Hanegraaf has suffered and continues to suffer personal hardships, including economic loss, stigma, emotional distress, pain and suffering, humiliation, career, family and social disruption and other grievous harm.

185.    There is no fully adequate remedy at law.

186.    By the foregoing conduct, Defendants have created and maintained a sexually hostile work environment on the basis of Hanegraaf's sex.

187.    By the foregoing conduct, Defendants have engaged in quid pro quo sexual harassment.

188.    By the foregoing conduct, Defendants have discriminated against Hanegraaf on the basis of sex.

189.    By the foregoing conduct, Defendants have unlawfully retaliated against Hanegraaf for engaging in conduct that is protected by federal law and local ordinance.

190.    Defendants' conduct violates Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq.

191.    Defendants' conduct violates the Philadelphia Fair Practices Ordinance, Philadelphia Code, §§ 9-1101 et seq.

192.    On January 10, 2014, Plaintiff Kathryn Hanegraaf filed a charge of sex discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC") and cross-filed with Pennsylvania Human Relations Commission.

193.    On March 11, 2016, plaintiff received from the EEOC a Right to Sue letter.

194.    Plaintiff Kathryn Hanegraaf is entitled to all legal and equitable remedies available for the violations of Title VII and the Philadelphia Fair Practices Ordinance, including monetary loss, compensatory and punitive damages, liquidated damages, prejudgment interest, costs and attorney's fees.

IV.    **CLAIMS FOR RELIEF**

**COUNT 1**

**SEX DISCRIMINATION AND HOSTILE WORK ENVIRONMENT
IN VIOLATION OF TITLE VII AND THE PHILDADELPHIA FAIR
PRACTICES ORDINANCE**

195.    Plaintiff Kathryn Hanegraaf re-alleges and incorporates by reference each and every allegation in the preceding paragraphs of this Complaint as though set forth fully and at length herein.

196.    The above-described actions of Defendants and their employees constitute sexual harassment and retaliation in violation of Title VII and the Philadelphia Fair Practices Ordinance in that Plaintiff was subjected to having to work in a severe, persistent and/or pervasive hostile, intimidating and offensive work environment, which interfered with her work performance, denied her privileges, and adversely affected the terms and conditions of her employment on the basis of her sex.

197.    The harassing conduct to which Plaintiff was subjected was so severe, widespread and/or persistent that a reasonable person in Plaintiff's circumstances would have considered the work environment to be hostile or abusive.

198.    Plaintiff considered the work environment to be hostile and/or abusive.

199.    When Plaintiff reported the harassing conduct to PMD management, Defendants engaged in retaliatory conduct toward Plaintiff as set forth above, including but not limited to terminating her employment.

200.    Even once on notice regarding the harassing and discriminatory conduct to which Plaintiff was subjected, Defendants failed to take appropriate action against the harasser and instead exonerated him and thus ratified his conduct.

201.    Defendants' violations of Title VII and the Philadelphia Fair Practices Ordinance caused Plaintiff to suffer damages in the form of past and future wage loss, other pecuniary losses, loss of potential pay increases and promotions, emotional distress, grief, stress, anxiety, mental anguish, and loss of enjoyment of life in an amount to be proven at trial.

202.    As a result of Defendants' unlawful acts, Plaintiff is entitled to compensatory damages, equitable relief and attorney's fees and costs.

203.    Defendants did the acts alleged herein maliciously, fraudulently, and with the intent to injure Plaintiff, and/or with conscious disregard of the rights secured to Plaintiff by local, state and federal law.   Plaintiff is thus entitled to recover punitive damages from Defendants in an amount to be proven at trial.

## COUNT 2

### RETALIATION IN VIOLATION OF TITLE VII AND THE PHILDADELPHIA FAIR PRACTICES ORDINANCE

204.    Plaintiff Kathryn Hanegraaf re-alleges and incorporates by reference each and every allegation in the preceding paragraphs of this Complaint as though set forth fully and at length herein.

205.    Defendants' acts as alleged herein constitute unlawful retaliation against Plaintiff because of her protected activity in pursuing complaints of discrimination and retaliation on account of her sex.

206.    Plaintiff suffered a materially adverse employment action causally related to her protected activity, including but not limited to her termination from employment.

207.   Defendants' retaliatory acts in violation of Title VII and the Philadelphia Fair Practices Ordinance caused Plaintiff to suffer damages in the form of past and future wage loss, other pecuniary losses, loss of potential pay increases and promotions, emotional distress, grief, stress, anxiety, mental anguish, and loss of enjoyment of life in an amount to be proven at trial.

208.   As a result of Defendants' unlawful acts, Plaintiff is entitled to compensatory damages, equitable relief and attorney's fees and costs.

209.   Defendants did the acts alleged herein maliciously, fraudulently, and with the intent to injure Plaintiff, and/or with conscious disregard of the rights secured to Plaintiff by local, state and federal law.  Plaintiff is thus entitled to recover punitive damages from Defendants in an amount to be proven at trial.

## V.   JURY DEMAND

Plaintiff herein demands a trial by jury for all issues in this action.

## VI.   RELIEF REQUESTED

WHEREFORE, Plaintiff Kathryn Hanegraaf demands judgment against the Defendants and requests the following relief:

A.   Declaring the acts complained of herein to be in violation of Title VII;

B.   Declaring the acts complained of herein to be in violation of the Philadelphia Fair Practices Ordinance;

C.   Entering judgment against the Defendants and in favor of Plaintiff in an amount to be determined;

D.   Ordering that Defendants reinstate Plaintiff to her position with Defendants or to a comparable position in terms of salary, benefits and responsibilities;

22

E.      Ordering that Defendants make Plaintiff whole for all the losses she has suffered, still suffers, and will suffer in terms of lost wages, benefits, insurance and pension coverage and any other fringe benefits of her employment;

F.      Awarding compensatory damages to make Plaintiff whole for all lost earnings, earning capacity and benefits, past and future, which Plaintiff has suffered or may suffer as a result of Defendants' improper conduct;

G.      Awarding compensatory damages to Plaintiff for past and present pain and suffering, emotional upset, mental anguish, humiliation, and loss of life's pleasures, which Plaintiff has suffered and continues to suffer as a result of Defendants' improper conduct;

H.      Awarding Plaintiff pre-judgment and post-judgment interest;

I.      Awarding Plaintiff reasonable attorneys' fees, paralegal fees, expert witness fees and all costs, expenses and disbursements associated with pursuing this action;

J.      Awarding Plaintiff punitive damages on the grounds of upper management's actual participation in and/or willful indifference to Defendants' discrimination, harassment and retaliation against Plaintiff under Title VII and the Philadelphia Fair Practices Ordinance;

K.      Awarding Plaintiff such other damages as are appropriate under Title VII and the Philadelphia Fair Practices Ordinance; and

L.      Granting Plaintiff such other relief as the Court deems just, proper and/or equitable.

Respectfully submitted,
*Greenblatt Pierce Engle Funt & Flores, LLC*

Dated: June 9, 2016

*/s/ Patricia V. Pierce*_____
Patricia V. Pierce, Esquire
Email: p.pierce@gpeff.com
Noah Cohen, Esquire
Email: n.cohen@gpeff.com
123 South Broad Street, Suite 2500
Philadelphia, PA 19109
(215) 735-1600
(215) 735-1660 (fax)
*Attorneys for Plaintiff Kathryn Hanegraaf*

*DWYER & BARRETT, L.L.C.*

*/s/ Andrew Dwyer*_____
Andrew Dwyer
Email: andy@dwyerbarrett.com
17 Academy Street, Suite 1201
Newark, New Jersey 07102
(973) 242-3636
(973) 242-3399 (fax)
*Attorneys for Plaintiff Kathryn Hanegraaf*